AMERICAN CIVIL LIBERTIES UNION FOUNDATION
Aden J. Fine
Andre Segura
125 Broad Street, 18th Floor
New York, NY 10004
212.549.2500

NEW YORK CIVIL LIBERTIES UNION FOUNDATION
Palyn Hung
125 Broad Street, 19th Floor
New York, NY 10004
212.607.3300

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAED JARRAR, <br><br> Plaintiff, <br><br> v. <br><br> GARFIELD HARRIS, Transportation Security Administration Inspector # I 2425, in his individual capacity; JETBLUE AIRWAYS, CORP.; FRANCO TROTTA, in his individual capacity; and JOHN and JANE DOES 1-9, <br><br> Defendants. | Civil Action No.: 07-CV-3299 (CBA) (JO) <br><br> **AMENDED COMPLAINT AND JURY DEMAND** |

## **INTRODUCTION**

1. Since September 11, 2001, there has been a disturbing pattern of discriminatory acts at airports against individuals perceived to be Arab, especially those engaged in expressive activities that visibly display their ethnic background or religious faith. This discrimination has been particularly common following the government's issuance of heightened security alerts. This case arises out of yet another incident in which a person was targeted and discriminated against by a federal government official and a U.S. airline in the wake of heightened security alerts because he appeared to be of Arab descent.

2. On August 12, 2006, at John F. Kennedy International Airport ("JFK Airport"), Defendant Harris, a Transportation Security Administration official, Defendant Trotta, a Transportation Security Administration official, and Defendant JetBlue forced Plaintiff Raed Jarrar to cover a constitutionally protected message on his t-shirt before permitting him to board his JetBlue flight. The message, written in both Arabic script and English script, stated, "WE WILL NOT BE SILENT." Mr. Jarrar was told he had to cover the message on his t-shirt because Arabic script was not permitted at airports and because other passengers felt uncomfortable. Mr. Jarrar attempted to explain the meaning of his t-shirt and his constitutional rights to Defendants to no avail. In response, he was told that he could not wear a t-shirt with Arabic script at an airport because that was analogous to a person at a bank wearing a t-shirt that stated, "I am a robber."

3. To compound their improper actions, Defendants then forced Mr. Jarrar to sit at the very back of the plane, even though he had reserved a seat at the front of the plane weeks earlier and had already checked in for that seat.

1

4. Defendants' actions were solely based on Mr. Jarrar's perceived race and ethnicity, and the message on his shirt; they were not based on any legitimate security considerations. In fact, Mr. Jarrar had already successfully passed through the normal security checkpoint and a secondary security checkpoint, and after he was forced to cover his t-shirt and reassigned to the back of the plane, he was never once questioned or searched by security personnel. Instead, he was immediately ordered to go to the back of the plane and to take his seat, boarding even before disabled passengers and those traveling with children.

5. Mr. Jarrar brings this civil rights lawsuit under the First Amendment, Fifth Amendment, and federal, state, and city anti-discrimination laws. He seeks declaratory relief, injunctive relief, and compensatory and punitive damages.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. This Court has authority to grant declaratory, injunctive, and monetary relief pursuant to 28 U.S.C. §§ 1343, 2201, and 2202, and to award costs and attorneys' fees under 28 U.S.C. § 2412.

7. The events giving rise to the claims alleged in this Complaint occurred at JFK Airport. Venue therefore lies in the Eastern District of New York, pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(2).

## THE PARTIES

8. Plaintiff Raed Jarrar is twenty-nine years old and is currently a resident of Washington, D.C. At the time of the events that are the subject of this lawsuit, Mr. Jarrar was a resident of California. He was born in Iraq and is a conditional permanent resident of the United

States. Mr. Jarrar, a trained architect, is an expert on issues related to Iraq and its redevelopment. He is currently employed as the Iraq Consultant for the American Friends Service Committee, an organization committed to service, development, social justice, and peace programs throughout the world. He previously served as the Iraq Project Director for Global Exchange, an international human rights organization that promotes social, economic, and environmental justice. In these positions, Mr. Jarrar has sought to facilitate understanding and communication among leaders and policymakers in the United States and Iraq. Mr. Jarrar moved to the United States from Iraq on September 13, 2005, to be with his wife, a U.S. citizen. He has dark hair, brown eyes, and brown skin; his physical appearance is similar to that commonly associated with individuals of Arab descent.

9. Defendant Garfield Harris' residence is currently unknown to Plaintiff. Upon information and belief, at the time of the events giving rise to this action, Harris was working at JFK Airport as Inspector # I 2425 for the Transportation Security Administration ("TSA"). He is sued here in his individual capacity.

10. Defendant JetBlue Airways, Corp. ("JetBlue") is an air carrier engaged in the business of transporting passengers. Its corporate headquarters are located at 118-29 Queens Boulevard, Forest Hills, NY 11375. Upon information and belief, JetBlue receives federal financial assistance from the U.S. Department of Transportation, pursuant to sections 101 and 102 of the Air Transportation Safety and System Stabilization Act, P.L. 107-42.

11. Defendant Franco Trotta's residence is currently unknown to Plaintiff. Upon information and belief, at the time of the events giving rise to this action, Trotta was working at JFK as the Acting Terminal Manager for the TSA and was responsible for supervising Defendant Harris' actions and interactions with Plaintiff Jarrar. He is sued here in his individual capacity.

12. Defendants John and Jane Does 1-9 are individuals currently unknown to Plaintiff who worked for JetBlue or for federal, state or local governmental bodies, who were involved in forcing Plaintiff to cover the message on his t-shirt before Plaintiff was allowed to board JetBlue Flight #101 on August 12, 2006, and/or who were involved in forcing Plaintiff to sit at the back of that flight.

## FACTS GIVING RISE TO THIS ACTION

13. On May 14, 2006, the American Friends Service Committee invited Mr. Jarrar to speak at an event on the National Mall in Washington, D.C. At the event, Mr. Jarrar was given a black t-shirt with white lettering across the chest, stating in Arabic script and English script "WE WILL NOT BE SILENT." Mr. Jarrar learned that thousands of such t-shirts in multiple languages had been distributed by a group of artists known as the Critical Voice. An image of the shirt is available at www.aclu.org/jarrarshirt.

14. The message "WE WILL NOT BE SILENT" originated with the student resistance movement called White Rose in Nazi Germany. The White Rose encouraged the German people to resist the Nazis by distributing leaflets; their fourth leaflet was signed, "we will not be silent."

15. Mr. Jarrar views the message "WE WILL NOT BE SILENT" as the minimum obligation of all people who witness human suffering and violations of human rights. Expressing that message in Arabic script is essential to Mr. Jarrar because, among other things, it enables him to convey the universality of the message, which Mr. Jarrar believes that all people should learn.

16. On July 19, 2006, Mr. Jarrar booked and paid for an electronic ticket to travel on JetBlue Flight #101, scheduled to depart from JFK Airport on August 12, 2006, at 9:25 a.m.

EDT for Oakland, California. When booking the ticket, Mr. Jarrar reserved seat 3A, the front-most available window seat.

17. On August 10, 2006, in a much publicized incident, British authorities announced the arrests of individuals believed to be connected with a plot to blow up airliners in flight from London to the United States. In response, the Department of Homeland Security ("DHS") raised the security alert for all domestic and international flights and instituted new policies, procedures and directives for airports.

18. Two days later, on the morning of August 12, 2006, Mr. Jarrar was wearing the t-shirt stating "WE WILL NOT BE SILENT" in English and Arabic script when he went to JFK Airport for his flight home to California.

19. To avoid any security problems at JFK Airport due to the new DHS rules and policies, Mr. Jarrar packed all of his belongings into his luggage to check in before the flight. Upon arriving at the airport, he checked in at a self-serve e-ticket kiosk, which produced his boarding pass for seat 3A. Mr. Jarrar proceeded to wait in line at the JetBlue ticket counter to check his luggage. When it was his turn, a JetBlue employee asked for Mr. Jarrar's identification, and Mr. Jarrar presented his California driver's license. After he checked in his luggage, Mr. Jarrar was left with only his wallet, cell phone, boarding pass, and the clothes he wore.

20. Mr. Jarrar proceeded to the airport security checkpoint. Mr. Jarrar walked through the metal detector without sounding the alarm. Nevertheless, he was directed to a secondary security checkpoint, where an agent asked for his boarding pass and identification. After Mr. Jarrar handed over his boarding pass and driver's license, the agent examined them. The same agent patted down Mr. Jarrar, and then directed him to remove his shoes, which were

5

tested for chemicals. Following this comprehensive security screening, Mr. Jarrar's boarding pass and driver's license were returned. The agent then motioned Mr. Jarrar away, indicating that he could continue to Gate 16, from where his flight was scheduled to depart.

21.     After finding Gate 16, Mr. Jarrar went to an ATM, then walked to a nearby restaurant where he bought a small breakfast. He returned to Gate 16, found a seat, and ate.

22.     At no time while he was in the gate area eating his breakfast, or at any time since arriving at the airport, did Mr. Jarrar do anything or say anything that could reasonably have been believed to make Mr. Jarrar a security or public safety risk.

23.     Shortly after he began to eat his breakfast, two government officials approached him. Mr. Jarrar later learned that the officials were TSA Inspector Harris and TSA Acting Terminal Manager Trotta. Harris showed Mr. Jarrar a badge, and said that Mr. Jarrar should follow him. Trotta participated and remained present during the interactions with Mr. Jarrar. Mr. Jarrar immediately became scared because he did not know what was wrong or what he could possibly have done.

24.     Harris and Trotta took him to the counter at Gate 16. A female JetBlue employee was waiting there; upon information and belief, the female JetBlue employee was the Lead JetBlue Customer Service Crewmember. The counter area was visible to all those in the boarding area.

25.     At the counter, Harris requested identification and a boarding pass from Mr. Jarrar, which Mr. Jarrar handed over. Harris then told Mr. Jarrar that people were offended by Mr. Jarrar's t-shirt, and that Mr. Jarrar would have to remove the shirt.

26.     Mr. Jarrar was shocked. He demanded to know why he was being asked to change his t-shirt, and explained that he did not know that the message would offend anyone.

6

27. In response, Harris asked whether Mr. Jarrar had any other shirts to wear. Mr. Jarrar responded that he had checked in his entire luggage.

28. Harris then interrogated Mr. Jarrar about where he lived, when and why he came to New York City, where he worked, and where he traveled. Mr. Jarrar answered each of these questions.

29. Harris asked Mr. Jarrar if he had a business card. When Mr. Jarrar opened his wallet, Harris peered into it and asked, "Is that a green card? Can I see it?" The green card had personal information such as the fact that Mr. Jarrar was born in Iraq. Harris took the card and wrote down the identifying information. Mr. Jarrar then asked for Harris's identifying information. Mr. Jarrar had Harris write down his name and badge number. Harris wrote: "Inspector Harris # I 2425." No other identifying information was provided.

30. Mr. Jarrar again asked why he was being told to remove his t-shirt. Harris replied that it was impermissible to wear a shirt with Arabic script at an airport, since that was analogous to a person wearing a t-shirt at a bank stating, "I am a robber."

31. Mr. Jarrar was shocked even more. He explained that the message on his t-shirt was not offensive, and that it only stated "WE WILL NOT BE SILENT" in both English and Arabic. Mr. Jarrar further explained how and where he had obtained the t-shirt, and that thousands of t-shirts printed with the same slogan in multiple languages had been distributed.

32. Harris dismissed this explanation, stating that the agents could not verify what Mr. Jarrar's t-shirt said because they did not have a translator. Mr. Jarrar reiterated that the same statement appeared in both Arabic and English. Harris responded that it was not necessarily the same message.

33. Harris then told Mr. Jarrar to wear the t-shirt inside out. Mr. Jarrar refused, explaining that it was his constitutional right to display the message on the t-shirt. Trotta responded by telling Jarrar that his constitutional rights did not matter because, "People in the U.S. do not know about these constitutional rights."

34. Mr. Jarrar reiterated that it was his constitutional right to express himself through the message on his t-shirt. He asked if there were laws or regulations prohibiting clothing with Arabic script in airports. He did not receive an answer from Harris, Trotta or the JetBlue Customer Service Crewmember. He said that he would cover his t-shirt only if the agents told him of a law or regulation indicating that Arabic script was prohibited at airports.

35. During this exchange, a man with a JetBlue badge came up to the counter. This man appeared openly hostile and threatening, and he did not acknowledge Mr. Jarrar. He asked Harris for Mr. Jarrar's green card information and wrote it down. Mr. Jarrar was able to view the man's badge and wrote down its contents: Anthony Harmon, JetBlue ID# 012132403. Upon information and belief, Harmon is a JetBlue Customer Service Crewmember.

36. Mr. Jarrar then asked to speak with the agents' supervisors, so that he could explain his constitutional rights and ask about laws or regulations prohibiting Arabic script at airports. Harris told Mr. Jarrar that he did not need to talk with anyone else. He stated that customers had complained about Mr. Jarrar's t-shirt before Mr. Jarrar reached the first security checkpoint and while Mr. Jarrar was waiting in the boarding area. Harmon then threateningly said to Mr. Jarrar, "Let's end this in a nice way."

37. By this point, Mr. Jarrar was terrified. The statements, demeanor, and conduct of Harris, Trotta, Harmon, and the Lead JetBlue Customer Service Crewmember – all of whom surrounded Mr. Jarrar at the counter – made clear that Mr. Jarrar could not board his flight if he

insisted on displaying the message on his t-shirt. Mr. Jarrar was scared that he would be harassed further, be arrested, or even deported, and that he would miss his flight, simply because he looked Arab and wore a t-shirt with a message that the agents or other passengers disliked.

38. The Lead JetBlue Customer Service Crewmember then stated that she would buy Mr. Jarrar a new shirt to wear on top of the one he already had on as a "compromise." Harris, Trotta and Harmon nodded, indicating that such a resolution would be fine. Mr. Jarrar responded that wearing another t-shirt was not a compromise for him; it was his constitutional right to display the message on his own t-shirt. Because Mr. Jarrar did not want to be arrested and did not want to miss his flight, he had no choice but to agree to cover his t-shirt with another shirt. He reluctantly agreed to do as they said, and told the agents that he would pursue his rights through a legal rights organization.

39. The Lead JetBlue Customer Service Crewmember then offered to purchase an "I love New York" t-shirt for Mr. Jarrar, but Harris disapproved, stating that Mr. Jarrar should not be forced to go from one extreme to another. When Mr. Jarrar asked why they assumed that Mr. Jarrar hated New York, the agents did not respond.

40. The Lead JetBlue Customer Service Crewmember then went to purchase a shirt, while Harris, Trotta and Harmon stood guard around Mr. Jarrar at the counter. The Lead JetBlue Customer Service Crewmember returned after several minutes with a gray t-shirt that said, "All Original New York Authentic Brand."

41. Under the agents' watchful eyes, Mr. Jarrar put on the new t-shirt on top of the shirt he was already wearing. He reiterated that he would seek to protect his legal rights in the future. Harmon told him to do so.

9

42. At no time during the entire discussion with Harris, Trotta and the JetBlue agents did Defendants ever say or indicate that they believed that Mr. Jarrar posed any security or public safety issues. Nor did they ever ask Mr. Jarrar any questions about anything he had said or done since arriving at the airport.

43. Defendant Trotta was present for all of this, participated directly in the interactions with Plaintiff, and witnessed all of Defendant's Harris actions and statements to Plaintiff. At no time did Trotta, the Acting Terminal Manager for the TSA, who was in a supervisory role, ever intervene to prevent and/or stop Plaintiff's rights under the First and Fifth Amendments of the United States Constitution from being violated after observing that Plaintiff's constitutional rights were being so violated or having reason to know that Plaintiff's constitutional rights were being so violated, even though he had ample opportunity to do so. Nor did Defendant Trotta ever take any actions to remedy the violations after witnessing them. Instead, Defendant Trotta exhibited a deliberative indifference to Plaintiff's rights and/or committed gross negligence by failing to prevent or stop the unconstitutional acts from occurring.

44. Even though he had covered up his t-shirt, Mr. Jarrar was convinced, based on everything that had happened to him and everything that the agents had said and done to him, that he would still be arrested or deported. He returned to his seat in the boarding area. He felt embarrassed, ashamed, humiliated, and upset. Many people in the boarding area were staring at him. After sitting for a brief time, Mr. Jarrar sought to avoid other passengers' stares, so he stood up and waited a short distance from the JetBlue counter at Gate 16.

45. Within several minutes of the time that Mr. Jarrar stood up, a man standing behind the JetBlue counter wagged his finger at Mr. Jarrar and then motioned with his hand,

10

indicating that Mr. Jarrar should approach the counter. The man told Mr. Jarrar to give him his boarding pass, and Mr. Jarrar handed it over. The Lead JetBlue Customer Service Crewmember, who also was behind the counter, told Mr. Jarrar that his seat had been changed. She and the man behind the counter issued Mr. Jarrar a new boarding pass for seat 24A, instead of seat 3A, which Mr. Jarrar had reserved weeks earlier. The man then tore up Mr. Jarrar's original boarding pass. When Mr. Jarrar asked why his seat had been changed, the man behind the counter claimed that a passenger traveling with a child needed the seat that Mr. Jarrar had reserved. JetBlue has subsequently admitted that this claim was a pretext for its employees to move Mr. Jarrar to the back of the plane.

46. Mr. Jarrar was then ordered to board the plane immediately – as the first passenger – even before disabled passengers and those traveling with children were given an opportunity to board. He was not subjected to a single additional security check, either by airline personnel or by law enforcement. At no time was he told that he had behaved in a manner deemed suspicious.

47. Shaken even more, Mr. Jarrar did as he was told, going onto the plane and proceeding to seat 24A in the second-to-last row of the plane. He was extremely upset that he was being forced to sit at the very back of the plane. Mr. Jarrar was the only passenger on the plane for several minutes, and it was clear that he was being singled out for unusual treatment. As Mr. Jarrar sat alone on the plane, members of the flight crew stared at him and whispered to each other, as if he had done something wrong. He felt ashamed and humiliated, and scared about what was going to happen to him.

48. Throughout the flight, Mr. Jarrar felt as though he was being watched by the flight crew. He tried not to attract any attention, and rose from his seat only once to go to the

11

bathroom. Throughout the flight, Mr. Jarrar remained terrified: He feared that he would still be arrested upon reaching Oakland, and thought about how he could take care of his responsibilities before being sent to prison or deported.

49.     When his flight landed in Oakland, he was still terrified, and he fled the airport as quickly as possible. As soon as he left the airport, he removed the t-shirt that he had been given to cover his "WE WILL NOT BE SILENT" t-shirt.

50.     Defendants' treatment of Mr. Jarrar on August 12, 2006 terrified, embarrassed, and humiliated him. Beyond depriving Mr. Jarrar of the opportunity to express himself and to sit at the front of the flight like all other passengers, the incident left Mr. Jarrar feeling sickened and violated.

51.     Since August 12, 2006, Mr. Jarrar has felt and continues to feel uncomfortable reading Arabic script and wearing clothing with Arabic script in public places because he is afraid that he will again be subjected to discriminatory and unconstitutional treatment. Indeed, every time Mr. Jarrar has boarded a plane since August 12, 2006, he has worried about being subjected to discrimination and harassment.

52.     As a result of the treatment that Mr. Jarrar suffered on August 12, 2006, he has been deterred from wearing his t-shirt stating "WE WILL NOT BE SILENT" at airports and other government buildings.

53.     Mr. Jarrar frequently goes to airports because he flies regularly for business and personal travel. Mr. Jarrar's business travels require him to take, on average, one or two flights each month. In October 2007, his work will require him to travel by plane even more frequently when he embarks on a twelve-city national speaking tour related to his work.

54. Mr. Jarrar also frequently enters other government buildings for business purposes. For example, his work requires him to frequent federal congressional offices, and he has weekly meetings on Capitol Hill with federal employees.

55. Mr. Jarrar often dresses informally for these meetings and when he travels. Mr. Jarrar would like to be able to wear his "WE WILL NOT BE SILENT" t-shirt and other Arabic-language shirts to these meetings and on his travels because he believes the message is essential for all people, especially those in our government, to learn. If Mr. Jarrar were assured that government officials would not suppress his speech or discriminate against him in the future, Mr. Jarrar would wear his "WE WILL NOT BE SILENT" t-shirt to these meetings, in government buildings, and at airports.

56. As a result of the treatment that Mr. Jarrar suffered on August 12, 2006, he and his wife have been deterred from flying on JetBlue. Mr. Jarrar would like to fly on JetBlue in the near future. He flies frequently for business and personal travel, and JetBlue provides one of the most convenient and economical flights on the routes that Mr. Jarrar regularly travels. But for the threat of discrimination, it would be his airline of choice for his upcoming national speaking tour. If Mr. Jarrar were assured that JetBlue would not discriminate against him in the future, Mr. Jarrar would continue to fly JetBlue in the near future for business and personal travel.

57. Following the August 12, 2006 incident, Mr. Jarrar has learned of other airline passengers who have worn the same black t-shirt with English and Arabic script stating, "WE WILL NOT BE SILENT," on the flights of JetBlue and other airlines. Those passengers did not have any problems boarding their flights, nor were they asked to remove or cover their t-shirts, or forced to sit at the back of their flights. None of those passengers outwardly appears to be Arab; to the contrary, all are white.

58.     Documentation from the federal government demonstrates that discrimination persists on airlines. The Department of Transportation ("DOT") tracks consumer complaints in a monthly "Air Travel Consumer Report." In every month from January 2002 to June 2007, the last month for which statistics are available, the DOT has received complaints of discrimination by air carriers. Several of those discrimination complaints have been lodged against JetBlue.

59.     Subsequent to the events giving rise to this lawsuit, JetBlue has made statements denying any wrongdoing in connection with its treatment and actions toward Mr. Jarrar, and stating that the actions of its employees, including the changing of Mr. Jarrar's seat to the back of the plane, were appropriate and done in accordance with JetBlue policies and procedures.

## **REQUISITES FOR RELIEF**

58.     By reason of the factual allegations set forth above, an actual controversy has arisen and now exists between Plaintiff and Defendants. A declaration from this Court that Defendants' actions violated Mr. Jarrar's rights is therefore necessary and appropriate.

59.     Defendant JetBlue's continued discriminatory conduct and policies and procedures will result in irreparable harm to Mr. Jarrar, including, but not limited to, violations of his legal rights. Mr. Jarrar has no plain, adequate, or complete remedy at law to address the wrongs described in this complaint and to prevent them from occurring again. Mr. Jarrar therefore seeks injunctive relief restraining Defendant JetBlue from engaging in the unlawful acts and practices described herein.

## CLAIMS FOR RELIEF

### COUNT I: FIRST AMENDMENT

60. Plaintiff repeats and realleges paragraphs 1-59, as if set forth fully herein.

61. Defendant Harris and Defendant Trotta violated Plaintiff's rights to speech and expression, guaranteed by the First Amendment of the United States Constitution.

62. Defendant Harris' actions and Defendant Trotta's actions were intentional, malicious, willful, wanton, callous, and showed reckless disregard for Plaintiff's First Amendment rights.

### COUNT II: FIFTH AMENDMENT

63. Plaintiff repeats and realleges paragraphs 1-59, as if set forth fully herein.

64. Defendant Harris' actions and Defendant Trotta's actions violated Plaintiff's right to due process, guaranteed by the Fifth Amendment of the United States Constitution. The right to due process violated by Defendant Harris and Defendant Trotta encompasses both the equal protection guarantees protecting Mr. Jarrar against racial discrimination, and the procedural guarantees protecting Mr. Jarrar against improper prior restraints on his speech.

65. Defendant Harris' actions and Defendant Trotta's actions were intentional, malicious, willful, wanton, callous, and showed reckless disregard for Plaintiff's Fifth Amendment rights.

### COUNT III: 42 U.S.C. § 1981

66. Plaintiff repeats and realleges paragraphs 1-59, as if set forth fully herein.

67. Defendant JetBlue treated Mr. Jarrar less favorably than similarly situated passengers, and engaged in intentional discrimination based on Mr. Jarrar's perceived race, color, ethnicity, or ancestry.

68. JetBlue's actions caused Mr. Jarrar to suffer a deprivation of his right to make and enforce contracts.

69. JetBlue's actions violated 42 U.S.C. § 1981.

70. JetBlue's actions were intentional, malicious, willful, wanton, callous, and showed reckless disregard for Plaintiff's civil rights.

### COUNT IV: Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d)

71. Plaintiff repeats and realleges paragraphs 1-59, as if set forth fully herein.

72. Defendant JetBlue is the recipient of federal financial assistance. JetBlue treated Mr. Jarrar less favorably than other similarly situated passengers, and engaged in intentional discrimination based on Mr. Jarrar's perceived race, color, or national origin.

73. JetBlue's actions violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

74. JetBlue's actions were intentional, malicious, willful, wanton, callous, and showed reckless disregard for Plaintiff's civil rights.

### COUNT V: New York State Human Rights Law

75. Plaintiff repeats and realleges paragraphs 1-59, as if set forth fully herein.

76. JetBlue Flight #101, from which Mr. Jarrar was first prohibited from boarding and then relegated to the back of the plane, is a "place[] of public accommodation" within the terms of the New York State Human Rights Law. N.Y. Executive Law §§ 292(9) and 291(2).

77. On August 12, 2006, JetBlue denied Mr. Jarrar equal access to JetBlue Flight #101, compared with other similarly situated passengers.

78. JetBlue's actions were based on Mr. Jarrar's perceived race, creed, color, national origin, or ancestry.

16

79. JetBlue's actions violated the New York State Human Rights Law. N.Y. Executive Law § 290 et seq.

### COUNT VI:  New York City Human Rights Law

80. Plaintiff repeats and realleges paragraphs 1-59, as if set forth fully herein.

81. JetBlue Flight #101, from which Mr. Jarrar was first prohibited from boarding and then relegated to the back of the plane, is a "[p]ublic accommodation[]," and JetBlue is a "provider of public accommodation[s]," within the terms of the New York City Human Rights Law. N.Y. City Admin. Code §§ 8-102(9) and 8-107(4).

82. On August 12, 2006, JetBlue engaged in an unlawful discriminatory practice by denying Mr. Jarrar equal access to JetBlue Flight #101, compared with other similarly situated passengers.

83. JetBlue's actions were based on Mr. Jarrar's perceived race, creed, color, national origin, or ancestry.

84. JetBlue's actions violated the New York City Human Rights Law. N.Y. City Admin. Code § 8-107(4).

85. JetBlue's actions were intentional, malicious, willful, wanton, callous, and showed reckless disregard for Plaintiff's civil rights.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

(a) Declare that Defendant Harris' actions and Defendant Trotta's actions in forcing Mr. Jarrar to cover the message on his t-shirt were in violation of the First and Fifth Amendments of the United States Constitution.

(b)     Declare that Defendant Harris' and Defendant Trotta's actions and treatment of Mr. Jarrar on the basis of his perceived race, color, ethnicity, alienage, ancestry, and/or national origin were in violation of the Fifth Amendment of the United States Constitution.

(c)     Declare that the actions of Defendant JetBlue constituted discrimination on the basis of race, color, ethnicity, alienage, ancestry, and/or national origin in violation of 42 U.S.C. § 1981; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d); the New York State Human Rights Law, N.Y. Executive Law § 290 et seq.; and, the New York City Human Rights Law, N.Y. City Admin. Code § 8-107(4).

(d)     Enter a permanent injunction prohibiting Defendant JetBlue and its directors, officers, agents and employees from singling out passengers for mistreatment based on their perceived race, color, ethnicity, ancestry and/or national origin, and ordering JetBlue and its directors, officers, agents and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future.

(e)     Award Plaintiff compensatory damages against Defendant Harris in an amount to be determined at trial for Plaintiff's loss and injury.

(f)     Award Plaintiff compensatory damages against Defendant JetBlue in an amount to be determined at trial for Plaintiff's loss and injury.

(g)     Award Plaintiff compensatory damages against Defendant Trotta in an amount to be determined at trial for Plaintiff's loss and injury.

(h)     Award Plaintiff punitive damages against Defendants Harris, Trotta and JetBlue in an amount to be determined at trial that would punish Defendants Harris, Trotta and JetBlue

for their willful, wanton, and reckless conduct and that would effectively deter Defendants Harris, Trotta and JetBlue from engaging in similar conduct in the future.

      (i)      Award Plaintiff reasonable attorneys' fees and the costs incurred in this action.

      (j)      Award Plaintiff prejudgment interest.

      (k)      Award such other relief as the Court deems appropriate and just.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED: April 9, 2008                                  Respectfully submitted,

*/s/ Aden J. Fine*

Aden J. Fine
Andre Segura
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
212.549.2500
Fax: 212.549.2651
afine@aclu.org
asegura@aclu.org


New York Civil Liberties Union Foundation
    By Palyn Hung
125 Broad Street, 19th Floor
New York, NY 10004
212.607.3300
Fax: 212.607.3329
phung@nyclu.org

19